**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FATHI SAID, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | No. 23 C 2858 |
| v. | ) | |
| | ) | Chief Judge Virginia M. Kendall |
| MARCIN CHOJNACKI, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiffs Fathi Said and JBV Acquisitions LLC (collectively "Plaintiff"[1] or "Said") brought a complaint alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), (d), and various state-law claims. (Dkt. 2). It is one of 15[2] related cases, all in front of this Court, that Plaintiff's attorneys have brought alleging that various overlapping Defendants engaged in a fraudulent real-estate investment scheme. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

Over the course of the litigation, numerous defendants settled with Plaintiff. Nonetheless, four separate sets of Defendants filed motions for summary judgment against Said: Defendant CK Developers, PLLC ("CK Defendants") (Dkt. 222); Defendants BMO Property Management, Inc. and David Brandonisio ("Brandonisio Defendants") (Dkt. 228); Defendants Kendall Murphy, 1st Midwest Financial, Inc. ("Murphy Defendants") (Dkt. 230); and Defendant Marcin Chojnacki along with related entities (Chojnacki Defendants) (Dkt. 233). Unlike in many of the other related

[1] Because Said is the sole member of JBV Acquisitions, a limited liability company organized under Georgia law, the Court refers to "Plaintiff" in the singular.
[2] There were as many as 16 related cases, but one, *Ascot Specialty Insurance Company, A Rhode Island Corporation v. Midwest Title & Closing Services LLC et al*, 1:24-cv-05216, settled and closed on December 4, 2025.

cases, Said's Complaint does not name Kathleen Long and certain related entities as a Defendant (Dkt. 2); thus, references to Long are included only as far as they are relevant to the Motions.

For the below reasons, the Chojnacki Defendants' Motion for Summary Judgment (Dkt. 233) and CK Developers' Motion (Dkt. 222) are granted in part and denied in part. As to the RICO claims: the Motions are granted with regard to Plaintiff's attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; they are otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein and will proceed to trial unless the parties can reach a settlement. The Court grants in full the other two sets of Defendants' Motions. (Dkts. 228, 230). The Court also grants summary judgment on all state-law claims as to all Defendants.

## BACKGROUND

As an initial matter, the Court turns to the sufficiency of the parties' Rule 56.1 statements. As this Court makes explicit in its standing order on summary judgment, it requires strict compliance with the terms of the rule, and failure to abide may result in the Court striking briefs, disregarding statements of fact, deeming statements of fact admitted, or denying summary judgment. In this case in particular, Plaintiff has filed no fewer than 197 statements of undisputed material fact, an egregious departure from the requirement that "the respondent shall be limited to 40 statements of undisputed material fact absent prior leave of the Court." Even if Plaintiff assumed that he was entitled to 40 statements per Defendant without leave of the Court (itself questionable as an assertion given that two of the Defendants filed only 9 and 10 statements of material fact, respectively), Plaintiff still blew past 160 statements. The Chojnacki Defendants, for their part, declined to respond to Facts 161–197 on this ground.

Further, Plaintiff's attorneys continue to routinely insert entire paragraphs worth of fact statements into each individual fact entry, violating the Rule's demand for concision. *Schwab v.*

*Northwestern Illinois Medical Center*, 42 F. Supp. 3d 870, 874 (N.D. Ill. 2014) (Feinerman, J.). In a similar vein, Plaintiff's attorneys routinely copy-and-paste parts of their expert's reports into their statements of fact, as well as repeatedly start factual assertions with the phrase, "It is not okay with Fathi that. . . ," a bad faith approach to this stage of litigation. (*See, e.g.*, Dkt. 257 ¶¶ 60, 145). It is also inappropriate to do as multiple parties did herein, which is to admit a fact and then proceed to provide further information in the response. *See Buttron v. Sheehan*, 2003 WL 21801222, at *5 (N.D. Ill. Aug. 4, 2003) (St. Eve, J.). Finally, at the summary judgment phase, a plaintiff no longer can rely on the allegations of her complaint and must point to depositions, affidavits, or other evidence that is admissible. Fed. R. Civ. P. 56(e); *Reed v. Palmer*, 906 F.3d 540, 549 (7th Cir. 2018).

By blatantly disregarding the requirements of Rule 56.1, the Parties have frustrated the Rule's purpose and created a "sea of paper [that] wastes both the Court's time and the clients' resources." *Bixby v. JP Morgan Chase Bank, N.A.*, 2012 WL 832889, at *2 (N.D. Ill. Mar. 8, 2012); *Wilbern v. Culver Franchising Sys., Inc.*, 2015 WL 5722825, at *17 (N.D. Ill. Sept. 29, 2015) ("[T]hese filings violated the letter and spirit of the Local Rule in multiple ways, but most egregiously by bombarding the Court with factual and legal arguments that are outside the purpose of Rule 56.1 statement."). It would take pages to address every improper assertion and resolve each dispute and objection in the parties' Rule 56.1 filings. Instead, the Court credits only those statements that are adequately supported in the record and relevant to the resolution of the Motions. *Roger Whitmore's Auto. Servs., Inc. v. Lake Cnty., Illinois*, 424 F.3d 659, 664, n.2 (7th Cir. 2005) ("[I]t is not the duty of the district court to scour the record in search of material factual disputes. . . ."). This Court has the discretion to deem admitted facts that either side does not expressly admit yet fails to dispute with citations to admissible evidence in the record. *See Dade v. Sherwin–*

*Williams Co.*, 128 F.3d 1135, 1139 (7th Cir. 1997) (referring to L.R. 56.1's predecessor rule, the court affirmed the district court's taking as true uncontroverted facts alleged in the movant's statement and supported by references to the record).

In the interest of justice, the Court will not exclusively review Plaintiff's first 40 statements of fact, but the Court will broadly disregard statements beyond 160, as well as those earlier statements that sit too far astray from the core issues in this proceeding or that require the Court to go on an unwieldy journey through insufficient filings. *See Hinterberger v. City of Indianapolis*, 966 F.3d 523, 529 (7th Cir. 2020) (no abuse of discretion where the district court struck a party's entire statement of material facts "because requiring the district court to sift through improper denials and legal argument in search of a genuinely disputed fact would defeat the purpose of the [local summary-judgment] rule. The district court does not shoulder the obligation to separate the fair from the foul, doing the work for the parties and identifying what facts are truly disputed and may require resolution at a trial."); *see also Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) ("It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies.").

Moreover, throughout their response to Plaintiff's 56.1 statement, Defendants frequently object to cited emails on authenticity grounds. Unless indicated otherwise, this objection is generally overruled. Federal Rule of Evidence 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). In this Circuit, the act of production is typically an implicit authentication of documents produced. *See United States v. Lawrence*, 934 F.2d 868, 870–872 (7th Cir.1991); *United States v.*

*Brown*, 688 F.2d 1112, 1114–15 (7th Cir.1982). Defendants' attempts to distance themselves from Chase Real Estate's productions are improper given the established employment relationship between the remaining Defendants and Chase, and the numerous emails to/from Chojnacki himself. Further, the citation to *Gas Technology Institute* is inapposite, as it deals with the FBI's findings at a co-defendants house in a criminal context and still acknowledges nonetheless that "Plaintiffs may have other means" of meeting their *prima facie* showing. *See Gas Tech. Inst. v. Rehmat*, 524 F. Supp. 2d 1058, 1076 (N.D. Ill. 2007); *cf. Cox v. CA Holding Inc.*, 2015 WL 631393 at * 10 (S.D. Ind. Feb. 13, 2015) (holding that "the custodian of records for the company relying upon another company's business records as part of a business transaction can authenticate those records as part of its own business records").

As is the case in numerous related cases, Defendants' objections to various emails sent to and from the Chojnacki Defendants in the course of work on hearsay grounds are generally overruled. Unless otherwise indicated, these emails to and from Chojnacki—while out-of-court statements offered for their truth—fall under the exception for opposing party statements given the relationship between Chojnacki and his alleged agents and confirmed employees at the time of the events leading up to the case. Fed. R. Evid. 801(d)(2). The same applies to emails sent from other employees or agents of the Chojnacki Defendants sent during the employment/agency relationship, regarding the scope of that relationship. *Id.*; *see also* Fed. R. Evid. 803(6). Thus, these objections are overruled, and the Court considers the Exhibits where relevant to the analysis. The few other objections relevant to material facts are addressed below.

The following facts are undisputed unless otherwise indicated. Said, a California resident, is a real estate investor with an extensive portfolio of dozens of properties that he has owned and sold since 2016 in California, Illinois and other locations. (Dkt. 243 ¶¶ 1, 5). This matter arises out

of a series of real estate transactions made by Said between the Fall of 2020 and the summer of 2021 in the greater Chicago area. (Dkt. 243 ¶¶ 11).

(Former defendant) Chase Real Estate, LLC, owned and managed by Christian Chase, provided certain services to brokers for a fee, including allowing the brokers to use the www.mychaseagent.com domain and the mychaseagent.com email. (Dkt. 251 ¶ 1; Dkt. 254 ¶ 1; Dkt. 257 ¶ 1). Defendant Marcin Chojnacki ("Chojnacki") is a licensed real estate broker and was the designated managing broker for the Chase RE Roselle branch during the relevant time period. (Dkt. 243 ¶ 2). Robert Rixer ("Rixer") was a real estate broker for Chase RE Roselle during the relevant time period. (*Id.* ¶ 3). Former Defendant Laurena "Lori" Mikosz also was a real estate broker for Chase RE Roselle during the relevant time period. (*Id.* ¶ 4). Mikosz was Said's designated agent and broker for all of the transactions at issue. (*Id.* ¶ 4). Mikosz testified that she was unable to recall any of the specifics from the transactions she assisted Said with. (*Id.* ¶ 4). She testified that she could not recall the facts and circumstances of any of her correspondence with him. (*Id.* ¶ 4). She also testified that she did not remember any involvement in the transactions by Chojnacki. (*Id.* ¶ 4).

Chojnacki and Rixer jointly own Market Equities, Inc., a Delaware Corporation formed in 2022; Market Equities, Inc. is the sole owner of Defendant Illinois Assets as well as Defendant EJ Investments (since 2022) which in turn owns Defendant Mainstreet Property Management. (Dkt. 251 ¶¶ 4, 6; Dkt. 254 ¶¶ 4, 6; Dkt. 257 ¶¶ 4, 6). Defendant EJ Investments (EJ) was formed by Chojnacki and Rixer in 2020 and was initially owned by Chojnacki and his then-fiancé Long (who also share children); in 2022, Chojnacki and Rixer's Market Equities, Inc., assumed ownership of EJ. (Dkt. 257 ¶¶ 5–6, 12). Chojnacki's mother, Iwona, is EJ's bookkeeper. (Dkt. 257 ¶ 7). Rixer, Chojnacki and Long are signers on the EJ Investment bank account. (Dkt. 257 ¶ 8). Rixer and

Chojnacki also co-own Citypoint Illinois LLC and have both been brokers there since 2023; Rixer became the managing broker for Citypoint in 2023. (Dkt. 257 ¶ 9). The Chojnacki Defendants dispute that Long herself worked for Citypoint any earlier than April 2025. (Dkt. 257 ¶¶ 9, 12). Rixer and Chojnacki also co-owned the now dissolved Illinois Assets LLC. (Dkt. 257 ¶ 10).

Long is involved in this action through her alleged involvement in some of the financial entities that Plaintiff argues make up the Citypoint/Citipoint Enterprise: now dissolved Defendant First National Financial (FNF), now dissolved entity Defendant TCF National Holdings (TCF), and Prairie Raynor. Long was the sole shareholder, officer and director of FNF prior to its dissolution on December 20, 2024; she was also the sole signatory on FNF's bank account. (Dkt. 207 ¶ 20). Although Rixer and Chojnacki created TCF, Long was the sole shareholder and officer of TCF via FNF; Long was also the sole signatory on the bank account and sole person who had authority to act on behalf of the bank account for TCF, (which Defendants disputed in this case, but admitted on the *Malik* docket (Dkt. 436 ¶ 16), so the Court considers it admitted. (Dkt. 257 ¶¶ 20–22). Through this organizational structure, Long was the face of TCF; a design that Plaintiff asserts was to conceal Rixer and Chojnacki from the public record, whereas the Chojnacki Defendants assert was a decision made for branding purposes. (Dkt. 257 ¶ 24).

This case also features the Brandonisio Defendants as well as the CK Defendants, all of whom filed separately but are related to each other. Brothers Christopher, David and Kevin Brandonisio, childhood friends of Chojnacki, together operate three relevant businesses: 1) BMO Property Management, Inc., ("BMO") of which David was the sole shareholder prior to its dissolution; 2) National Asset Management, Inc. ("National Asset"), of which Chris was President and sole shareholder and of which Kevin was Secretary; and 3) CK Construction, of which Chris was President and of which Kevin was Senior Project Manager/Superintendent. (Dkt. 254 ¶¶ 37–

40; Dkt. 247 ¶ 2; Dkt. 244 ¶ 4). Chojnacki was a periodic customer of CK. (Dkt. 244 ¶ 7). BMO is one of Chris's clients in his personal capacity: he performed bidding services for BMO. (Dkt. 244 ¶ 22). Neither Chris nor Kevin has ever had an ownership interest in BMO and neither of them has been an officer of BMO. (Dkt. 244 ¶ 26). Plaintiff cites multiple examples of emails between Chris's email account "realestate1201@gmail.com" and Chojnacki, some of which address Chris's email as "David;" Chris was also copied on at least one email from Chojnacki discussing "marketing ads" for Flip Chicago. (*See, e.g.*, Dkt. 257 ¶¶ 64, 81). Chris also reported out properties won on behalf of 1st Midwest Financial and TCF National Holdings to Chojnacki, maintaining an "auction dashboard" that included receipts sent out for each transaction. (Dkt. 257 ¶ 68).[3]

Nonetheless, Said did not have any conversations with CK Developers, PLLC ("CK") prior to purchasing any of his properties. (Dkt. 244 ¶ 2). Said testified that he was not sure CK ever made any representations to him regarding the condition of the properties he purchased and that it worked on – CK merely provided quotes. (Dkt. 244 ¶ 3). Said also testified that he never met David Brandonisio, though he remembers communicating in some digital capacity with at least one of the brothers. (Dkt. 247 ¶ 8).

It is also undisputed that Kevin—a 50 percent owner of CK—is "not familiar with Flip Chicago" or Chase Real Estate, as well as that Kevin does not know why the names "David," "Kevin," and "Chris" appear on Flip Chicago's website or that they even appeared on that website. (Dkt. 244 ¶¶ 4–10). Nor does Plaintiff dispute that Chris also does not know why the names "David," "Kevin," and "Chris" appear on Flip Chicago's website, (*Id.* ¶ 16). Plaintiff also does not dispute that Kevin "does not know what [BMO] does or whether [it] holds title for a fee." (Dkt. 244 ¶ 11).

[3] Beyond this, though, Plaintiff peppers his 56.1 Statement with copious unnecessary and immaterial details about transactions that have nothing to do with Said's properties.

That leaves the Murphy Defendants. Murphy was the sole shareholder, President, and Director of 1st Midwest Financial, Inc. ("1st Midwest") (prior to its dissolution) and went to school with Chojnacki. (Dkt. 254 ¶¶ 44; Dkt. 241 ¶ 2). 1st Midwest owned 20 of the 25 properties complained of in Plaintiff's Complaint. (Dkt. 243 ¶ 8). Murphy testified that 1st Midwest's business was to hold title to properties for agents. (Dkt. 243 ¶ 9).

The corporate address initially listed on the Secretary of State's website for 1st Midwest was 1046 Midwest Road, in Northbrook, before being properly corrected to 1046 Midway Road in Northbrook, which the Murphy Defendants contend was a clerical error while Plaintiff argues this was part of a broader scheme on the confusing grounds that "the street name "Midwest" would reinforce the incorrect conclusion that 1st Midwest was a bank." (Dkt. 241 ¶¶ 4–5). Plaintiff testified that he never met, spoke, communicated with Murphy, and admitted that he has no proof that Murphy, individually, made or provided any of the alleged inaccurate information or misrepresentations communicated to him by his real estate agent, Mikosz and Chojnacki; Plaintiff testified that he has no proof that Murphy, individually, or 1st Midwest were involved in any of the post-closing repairs alleged in the Complaint. (Dkt. 241 ¶¶ 9–10).

With that, the Court turns to the facts that connect Said with this complicated web of actors. In October 2020, Said first connected with Chojnacki and Mikosz via email and Zoom to discuss a flipping venture called "Flip Chicago," which was affiliated with Chase. (Dkt. 243 ¶ 12). In email communications between Said, Chojnacki, and Mikosz on October 6–8, 2020, Said was told that the properties that he would be investing in were fast, low-risk investments with anticipated turnarounds of 30–90 days. (Dkt. 243 ¶ 13). Said testified in his deposition that he was interested in purchasing properties with Chase because they were offering to show him REO properties that he thought were being sold by banks as foreclosures. (Dkt. 243 ¶ 14).

While Said communicated with both Chojnacki and Mikosz, Said testified that Mikosz was positioned as the "project manager" for his acquisitions, handling coordination, renovation progress, and title-related communications. (Dkt. 243 ¶ 15). In her role as project manager, Mikosz provided Said with property packets, renovation scopes, and closing instructions, while also connecting him to "approved" vendors and title companies. (Dkt. 243 ¶ 16). Mikosz frequently reassured Said that all the properties were bank-owned REO assets being sold through institutional channels like "BMO Property Management" or "1st Midwest Financial." (Dkt. 243 ¶ 17). Additionally, Said claims that both Chojnacki and Mikosz told him these entities were banks. (*Id.*) Said also testified that he independently identified these entities were financial institutions from his own research. (Dkt. 243 ¶ 18).

By late October 2020, Said was wiring money to Lakeland Title. (Dkt. 243 ¶ 21). Through early 2021, he expanded his acquisitions, intending to scale from five to ten properties per month, with a goal of eventually handling thirty. (Dkt. 243 ¶ 22). Between February 2021 and May 27, 2021, Said closed on all of the subject properties for a total purchase price of approximately $5,000,000.00. (Dkt. 243 ¶ 23). He testified that he did not visit any of them prior to purchasing. (Dkt. 235, Exhibit E, Said Dep., 126:22-127:7). After each property was closed on, Mikosz would then hire contractors and begin work on the repairs outlined in the Project Information and Scope of Work that Chojnacki presented to Said for each purchase. (Dkt. 243 ¶ 29). After completing the renovations of all at-issue properties within seven months with Chase, Said became concerned with extensive cost overruns on the renovation projects as all of them were being completed by Mikosz's contractors. (Dkt. 243 ¶ 30).

The crux of Said's claim is that he thought he was buying directly from banks and not from wholesalers buying properties and immediately reselling to him; in line with this theory, Plaintiff

disputes that he was copied on several emails referencing "double escrow" transactions with multiple closings on the same properties, but does so without citation to the record and despite the fact that Exhibits U, V, and W (Dkt. 235) include his email address; the fact is thus deemed admitted. (Dkt. 243 ¶ 20). With regard to the Brandonisio brothers, Said alleges that "Chojnacki presented the Brandonisio brothers' CK Construction [] as an independent construction company and did not disclose that it was owned by his affiliates and childhood friends, Chris and Kevin Brandonisio;" it is unclear exactly how this relationship itself ties to Said's allegations. (Dkt. 257 ¶ 98). Plaintiff offers 2021 correspondence in which he asks Mikosz why CK's estimate came out to $55,000 and not $41,000; Mikosz forwarded the email to Chojnacki flagging that the bid "came much higher than anticipated," which Chojnacki then forwarded to Chris's personal email with the message "Stop killing deals." (Dkt. 246, Exhibit 87).[4] In another example, after Said asked Chojnacki and Mikosz if there was "any reason" to go with CK's $98,750 quote for a project over another company's $90,475 quote, Chojnacki responded with an assessment based on his "vast experience with both" in which he recommended going with the more expensive quote. (Dkt. 257 ¶ 99).

In the properties at issue in this case, Said invested a total of $4,941,900.00 in the properties ultimately reselling (or listing) his properties for $8,062,500.00. (Dkt. 243 ¶ 34). Said testified he eventually had ten foreclosures in Illinois. (Dkt. 257 ¶ 153). While most of Said's 56.1 Statement references to the sale prices of individual properties sit beyond statements 1–160, these assertions mostly just reassert that Plaintiff was unhappy with where his dollars were eventually wired, a sentiment that is not a requisite element of the case.

[4] Plaintiff asserts that this evidence alone establishes that Chojnacki "controlled" CK's bids, but this reading goes one step beyond what is actually offered, and is an inappropriate use of the 56.1 Statement. (Dkt. 257 ¶ 101).

This case also features a surprising development on the damages front: specifically, a late-stage surge in the alleged figures. Earlier, Plaintiff produced a damages spreadsheet listing 26 properties for Said and, for him specifically, identifies a total of $476,000 for "damages resulting from acquisition misrepresentations" and $300,000 estimate for "Rent/Repairs." (Dkt. 243 ¶ 32). Defendants, seeking more detail on the $300,000 figure, asked for the underlying basis; Said's interrogatory only broadly directed Defendants to "Plaintiff's Complaint and Exhibits;" (Dkt. 235, Exhibit N, 2025.05.07 Said Answer to Chase First Set of Interrogatories ¶¶4–5), Defendants again highlight that during the deposition, "Said and his attorney stated that there was a document produced which details these damages, no such document is known to the undersigned counsel and Plaintiff's counsel could not locate said document at the deposition despite her effort to do so," which Plaintiff (rather unhelpfully) responded to at the summary judgment stage as "lacking in materiality and relevance." (Dkt. 243 ¶ 33). Plaintiff now, in his Response, estimates "additional quantifiable damages above and beyond the stolen $483,500 discounted price . . . exceeding $3,222,750.19 from costs relating undisclosed building conditions and repairs" (the evidence of which traces back to a settlement spreadsheet that contains only bare assertions of costs) plus $1,017,121 from CK (the only evidence of which is an unsigned declaration from Said). (Dkt. 248 at 12).

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). "A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "[S]peculation and conjecture" also cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

## DISCUSSION

After removing the former Defendants, the remaining landscape of Count I is as follows: Malik alleges that the Chojnacki Defendants, the Murphy Defendants, and the Brandonisio Defendants violated § 1962(c), (d),[5] while the CK Defendants violated only § 1962(d). Given the fact that the Chojnacki Defendants filed substantively comparable motions for summary judgment in all of the related cases, the Court assumes familiarity with the analysis laid out in *Malik et al v.*

[55] The Complaint says "18 U.S.C. 1962(c), (d)," for these Defendants, but does not discuss the specific conspiracy aspect; nevertheless, the Complaint clearly indicates where the CK Defendants are only facing allegations under § 1962(d).

*Prairie Raynor LLC et al*, 23-cv-1182, and related dockets. Indeed, in this case, the Parties regurgitate their arguments with regard to the RICO claims almost verbatim, so the Court need not re-explicate its analysis on the same: as in *Stafford*, a jury could find that Said could have obtained at least some of the properties "at the same time in the same place" as Defendants; however, again as in *Stafford*, there can be no "lost investment bargain" theory of RICO injury where the value of property sold is not as high as represented, but is at least what the Plaintiff paid for it. On this record, nothing indicates that Said did not get the benefit of his bargain, most certainly not his conclusory opinions that he anticipated making more money on the flips. On the state law claims, Plaintiff and the Chojnacki Defendants can go to trial on the scope of damages, but where Congress inputs a statutory requirement on the claim's ability to go forward in the first place, this Court must heed that call.

This case differs slightly from *Stafford* with regard to the back-end claims. There, the Court permitted all of Stafford's alleged back-end damages to go forth regardless of Defendants' contentions about the vague and insufficient nature of the disclosures. Here, however, the record does not justify the late-stage evolution of Said's back-end damages to balloon from approximately $300,000 to more than 10x that figure. This testimony is not sufficient evidence because it is mere speculation, without a sound economic analysis to support it. While Said's claims can proceed on the alleged financial injuries descending from the representations made around the actual transaction, Plaintiff has not yet made the requisite establishment to put a seven-figure number in front of a jury.

This Court's resolution of the RICO "enterprise" requirement is likewise governed by its previous rulings. Said, like Malik and Stafford, has developed a record that could conceivably allow a reasonable jury to find that Chojnacki participated in the operation or management of an

enterprise to lure in investors through misrepresentations of building ownership and condition. Further, a § 1962(c) claim does not require proof that Chojnacki was the exclusive "boss" of the operation so long as a jury could find him reasonably involved in managing it. *See Muskegan Hotels, LLC v. Patel*, 986 F.3d 692, 698 (7th Cir. 2021) ("Lower-rung participants and even third-party outsiders can be liable, provided they play a part in operating or managing the enterprise"). For the CK Defendants, facing the § 1962(d) claim, the question is slightly different. Plaintiff need not prove that CK operated or managed the enterprise, instead, he would have to show that CK, "with knowledge of a conspiracy to violate the RICO statute, agreed to conduct or participate in the affairs of an enterprise through a pattern of racketeering and agreed to the commission of two predicate acts of racketeering." *Id.* at 699.

"[M]ere association with conspirators is not enough to establish an agreement." *See Domanus v. Locke Lord LLP*, 847 F.3d 469, 482 (7th Cir. 2017). Nonetheless, "when the acts performed by the alleged members of the conspiracy are unlikely to have been done alone, the court may infer agreement." *Domanus v. Locke Lord LLP*, 847 F.3d 469, 482 (7th Cir. 2017). On these facts, a jury could find that CK, particularly via the actions of Chris Brandonisio, was sufficiently intertwined in Chojnacki's operations, such as branding efforts around Flip Chicago and engagement in real estate transactions simultaneous to plaintiffs in the related cases, went beyond basic business interactions and instead met the criteria for § 1962(d). While the CK Defendants highlight that much of the correspondence upon which Plaintiff hangs his case involves Chris's personal email, and not one specifically linked to CK, but "[s]imply attaching these convenient, self-serving labels to these accounts does not make them so easily categorized." *DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 886 (N.D. Ill. 2021). Thus, both the CK and Chojnacki Defendants' arguments on this point are unpersuasive.

As for the other Defendants: Plaintiff made no effort to counter the specific arguments of the Murphy Defendants and the Brandonisio Defendants on the RICO claims with a single citation to case law; the best Plaintiff can do is lob allegations about the alleged criminality of these entities' tax filings—but Plaintiff is not the IRS nor the U.S. Attorney's Office, and these comments are unrelated to the facts at hand (namely, Plaintiff's specific transactions). The Court will not entertain such an underdeveloped argument. *See U.S. v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived"). Thus, the Murphy and Brandonisio Defendants' motions for summary judgment on the RICO claims are granted.

**I. State-Law Claims (Counts II–VII)**

Next, Chojnacki moves for summary judgment on Said's state law claims for common-law fraud (Count II), violation of the ICFA (Count III); violation of the IRELA (Count IV); negligent misrepresentation (Count V); and breach of contract for inaccurate rent roll (Count VII). (Dkt. 234). While this is not the first case in the related litigation in which Plaintiff fails to defend their claims, it is certainly one of the more egregious. Rather than engage with this contention on the substance, Plaintiff recites the general theory of the case with conclusory assessments, which are not sufficient to defeat a proper motion for summary judgment. *First Commodity Traders, Inc. v. Heinhold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985).

Plaintiff's defense of five counts amounts to three conclusory paragraphs. (Dkt. 248 at 23). Plaintiff cites not a single case. (*Id.*) His only support is two vague references to the 56.1 Statement of Fact, one of which is barred because it references statements beyond 160. Yet even considering everything put forth, these references are totally irrelevant to the resolution of the state-law issues and do not support Plaintiff's own representations. In no way do they come close to creating a

disputed issue of material fact. *See United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) (at the summary judgment stage, it is "not the district court's job to sift through the record and make (a party's) case for him"). As courts have often admonished, "summary judgment is the 'put up or shut up' moment in the life of a case." *See, e.g.*, *In re Airadigm Communications, Inc.*, 616 F.3d 642, 657 (7th Cir.2010). Thus, the Court will not "address those arguments which it finds incomprehensible." *Pope v. United States*, 2012 WL 5389807, at *2 (N.D. Ill. Nov. 1, 2012) (citing *Smith v. Town of Eaton, Ind.*, 910 F.2d 1469, 1470-71 (7th Cir. 1990)).

After the defendant has made its showing, the non-moving party must come forth with evidence showing what facts are in actual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). If the non-moving party fails to do so, summary judgment is proper. *United States v. Selenske*, 882 F.2d 220 (7th Cir.1989). Thus, the motion for summary judgment is also granted as to these state law claims. Said's wholly unsupported and cursory positions fail as a matter of fact and law.

That leaves the final state-law claim: Count VII: unjust enrichment. As this Court has already spelled out in *Malik*, recent cases in the Seventh Circuit have erred on the side of permitting no independent cause of action for unjust enrichment. *See Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019) (finding no standalone claim for unjust enrichment under Illinois law). Thus, the Court proceeds with the understanding that Illinois law does not consider unjust enrichment an independent cause of action but a "condition that may be brought about by unlawful or improper conduct as defined by law." *Flores v. Aon Corp.*, 242 N.E.3d 340, 356 (Ill. App. 2023) (quoting *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.*, 484 N.E.2d 349 (Ill. App. Ct. 1985), *aff'd*, 499 N.E.2d 1319 (Ill. 1986)). Plaintiff contends that

*Community Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803 (7th Cir. 2018) does not bar their case because no relevant contractual provision governs Plaintiff's relationship with Defendants, (Dkt. 249 at 24), but *Benson*'s more recent guidance triumphs. Thus, because the other state-law claims fall, so, too, must Count VII.

**CONCLUSION**

For the below reasons, the Chojnacki Defendants' Motion for Summary Judgment [233] and CK Developers' Motion [222] are granted in part and denied in part. The Motions are granted with regard to Plaintiff's attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; they are otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein and will proceed to trial unless the parties can reach a settlement. The Court grants in full the other two sets of Defendants' Motions. [228, 230]. The Court also grants summary judgment on all state-law claims as to all Defendants.

Virginia M. Kendall
United States District Judge

Date: September 9, 2026